**SO ORDERED.**

**SIGNED this 25 day of May, 2012.**



_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

IN RE:                                                          CASE NO.

**CROATAN SURF CLUB, LLC**                                     11-00194-8-SWH

      DEBTOR

### ORDER

The matters before the court are (1) the objections filed by the debtor and Edwards Family Partnership, LP ("EFP") to Claim No. 2 of Royal Bank America ("RBA"), (2) RBA's motion for post-petition interest on its secured claim, as well as attorney's fees if not allowed as asserted in its proof of claim, and (3) RBA's motion for a superpriority administrative expense claim. Hearings took place in Raleigh, North Carolina, on January 10, 2012 and January 11, 2012, as well as March 8, 2012.[1]

---

[1] During the course of the initial hearings, the parties asked the court to refrain from ruling on the objections to claim until further notice while the parties engaged in settlement negotiations. On February 27, 2012, RBA informed the court of its intention to proceed with the post-petition interest and superpriority administrative expense motions, and because a determination of those motions is dependent upon a determination of the objections to claim, requested that the court proceed to rule on the objections to claim.

BACKGROUND

Croatan Surf Club, LLC owns a 36-unit condominium complex in Kill Devil Hills, North Carolina (the "Subject Property"). The construction of the Subject Property was financed primarily by a December 20, 2007 loan from RBA for $17,000,000, which was guaranteed by various individuals and secured by a first priority deed of trust. As part of the loan documentation, a "Put Agreement" was executed which obligated the guarantors to obtain permanent refinancing for 10 separate units, and to pay RBA corresponding lien release fees within 6 months of the issuance of the Certificate of Occupancy for the Subject Property. On December 20, 2007, the debtor assigned the Put Agreement to RBA. Also on December 20, 2007, EFP provided the debtor with mezzanine financing of $3,000,000 in exchange for a junior deed of trust on the Subject Property. On December 31, 2007, RBA, the debtor, and EFP entered into a Subordination and Inter-Creditor Agreement (the "Subordination Agreement"), reflecting RBA's consent to the debtor's grant of a subordinate deed of trust to EFP, and outlining each creditor's duties and obligations based on their respective positions.

Although the original maturity date of the loan from RBA to the debtor was July 1, 2009, the debtor exercised an option to extend the loan's term by six months, through January 1, 2010.[2] On December 2, 2009, RBA declared an event of default based upon an alleged failure to meet obligations under the Put Agreement, but did not accelerate the balance of the loan at that time. RBA declared a second event of default as of January 1, 2010, alleging that the debtor had not paid

---

[2] Pursuant to the promissory note, two consecutive extensions of 6 months each were available to the debtor, if the debtor provided the bank with at least 60 days' notice, was not in default, and paid an extension fee.

the entire principal balance, accrued interest, and costs by the maturity date.[3] The loan documents between the debtor and RBA authorize RBA to record a confession of judgment against the debtor upon an event of default for any or all of the debt owed and associated expenses, as well as attorney's fees of 15% of that amount.[4] On February 12, 2010, RBA filed a complaint in confession of judgment against the debtor in the Montgomery County, Pennsylvania Court of Common Pleas, for $18,942,747.18. The confession of judgment entered on February 12, 2010 consists of the following:

| | |
|---|---|
| Principal | $16,306,399.73 |
| Interest through 01/19/10[5] | $     162,830.73 |
| Attorney's Fees | $  2,470,384.57 |
| Late Charges | $          3,132.15 |
| TOTAL | $18,942,747.18 |

The debtor filed a petition to open or strike the judgment on March 30, 2010, which was followed by several additional pleadings by both parties, and finally a suggestion of bankruptcy on February 14, 2011. According to a copy of the docket in this action as of November 10, 2011, no further activity occurred after the docketing of the suggestion of bankruptcy. At some point after filing the confession of judgment in Pennsylvania, RBA initiated foreclosure proceedings against the Subject Property, and a sale was scheduled for January 11, 2011.

---

[3] By letter dated March 26, 2010.

[4] The confession of judgment process in Pennsylvania allows a creditor, in certain lending scenarios, to obtain a judgment without going through the standard process of filing a complaint and waiting for an answer, discovery, hearings, etc. The creditor must file a complaint in confession of judgment, accompanied by the confession of judgment itself, numerous notices, and evidence of the debt. The effect of the judgment is immediate, however, relief is available upon petition to open or strike the judgment. If the court opens the judgment, a trial is held.

[5] At a per diem rate of $3,283.95.

The debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on January 10, 2011. RBA filed a proof of claim on February 16, 2011, in the amount of $19,059,327.40, which was amended on June 1, 2011 to reflect a claim of $20,108,549.43. According to RBA, this figure represents the amount of the confession of judgment, $18,942,747.18, plus interest under that judgment as of the petition date in the amount of $1,165,802.25. On September 2, 2011, upon the motion of RBA for valuation pursuant to § 506, the court determined that the value of the subject property is $18,500,000. The debtor filed its objection to RBA's claim on September 7, 2011, followed by an amended objection on October 24, 2011, and EFP filed a response in support of the debtor's objection as well as its own objection to RBA's claim on October 11, 2011. Although RBA sought to dismiss EFP's pleading for lack of standing based on the Subordination Agreement, the court held on November 15, 2011 that EFP had standing to object, albeit limited to the amount (i.e., reasonableness) of RBA's attorney's fees.

On October 21, 2011, RBA filed a motion to dismiss all objections and allow its claim in full, asserting that the Pennsylvania confession of judgment determined the amount of attorney's fees, interest, and late charges due pre-petition, and that the Rooker-Feldman doctrine bars this court from considering the objections because the confession of judgment is not subject to review by a federal court.[6] The debtor argued that this court was not asked to strike or modify the confession of judgment itself, but rather, the debtor sought to have RBA's claim determined for purposes of the bankruptcy case and that the court has jurisdiction over all proofs of claim. The debtor further asserted that it timely filed a motion to strike or open the confession of judgment, and although the

---

[6] Other than the United States Supreme Court. See In re Keeler, 273 B.R. 416, 420 (D. Md. 2002).

4

proceeding is stayed in light of the bankruptcy case, the motion is still pending, and therefore the confession of judgment is not subject to the Rooker-Feldman doctrine because it is not a final judgment. On November 15, 2011, this court issued an oral ruling on RBA's motion, finding that the Rooker-Feldman doctrine is one of narrow application, barring federal review of final judicial determinations of state courts. This court held that the petition to strike or open is akin to an appeal, and thus the Pennsylvania action is still pending, parallel litigation not precluded by the Rooker-Feldman doctrine. As such, the objections to claim are matters which this court may hear and determine without limitation by the confession of judgment.

Finally, on December 19, 2011, RBA filed a motion for the allowance of post-petition interest and attorney's fees, in the event that RBA is oversecured based upon the court's ruling on the objections to claim. On December 30, 2011, RBA filed a motion for allowance of a superpriority administrative expense claim, claiming that the adequate protection payments thus far are inadequate to protect the use of its cash collateral. RBA seeks a § 503(b) administrative expense claim for the use of its cash collateral for the operation and maintenance of the debtor's business, to the extent of the difference between the total amount of cash collateral used and the total amount of adequate protection paid.

Based on the nature of the motions presently before the court, the court must rule on the objections to RBA's claim prior to considering RBA's motion for post-petition interest and attorney's fees. If the court determines the claim is less than the value of the Subject Property and any other collateral, post-petition interest and attorney's fees may be available to RBA, to the extent that the claim is oversecured. If the court allows RBA's claim as filed, it would exceed the value of the collateral and RBA would not be eligible for post-petition interest or attorney's fees, rendering

that motion moot. Finally, the court will determine whether RBA is entitled to a superpriority administrative expense claim for the debtor's use of RBA's cash collateral for the operation and maintenance of the debtor's business.

## DISCUSSION

A.  The Objections Filed by the Debtor and EFP to RBA's Claim

Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." RBA's proof of claim was properly executed and filed and thus "constitute[s] prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f).

The debtor does not dispute the amount of principal owed as stated in RBA's claim, which is $16,306,399.73. The remaining components of the claim, however, consisting of interest, attorney's fees, and late fees, are contested. Starting with the interest component, the debtor contests the fact of default, the time of default, as well as the default rate imposed. It is the debtor's position that the default declared on December 2, 2009, based on the debtor's alleged failure to refinance certain units and make corresponding release payments to RBA under the Put Agreement, is invalid. Essentially, the debtor argues that it was not obligated to perform under the Put Agreement until a certificate of occupancy issued for the Subject Property, and that RBA improperly bases this default upon the May 15, 2009 issuance of a conditional certificate of occupancy. Further, the debtor contends that the interest should not be calculated at the default rate as claimed, which is 7.25%, but rather, should be calculated at the contract rate of 4.25%, based on its position that the default declared on December 2, 2009 was improper and that such improper default prohibited a permissible additional extension of the loan maturity date, which if allowed, would have obviated any default.

RBA contends, on the other hand, that although the Put Agreement default was an event of default, it did not elect to accelerate the debt at that time. According to RBA, the claim is based on the confession of judgment, which is premised on the default that occurred when the debtor failed to pay the balance due as of January 1, 2010, the maturity date of the loan. As such, RBA contends that it is immaterial whether the Put Agreement default was valid. Additionally, RBA states that the debtor was not entitled to an extension regardless of the Put Agreement-related default, that the loan therefore matured on January 1, 2010, and that it is entitled to the default rate of interest (which consists of the contract rate of 4.25% plus 3%) from the January 1, 2010 maturity date pursuant to the terms of the loan.

Although considerable evidence was presented regarding the finality of the May 15, 2009 certificate of occupancy and following certificate(s), the court does not find such evidence relevant to the determination of whether RBA's claim of interest at the default rate from January 1, 2010 is proper. The evidence shows that RBA declared two events of default: one under the Put Agreement on December 2, 2009, and another based on the January 1, 2010 maturity date. Regardless of the propriety of the Put Agreement default, it is clear that the debtor did default on the loan payments at some point, and the evidence suggests an extension was entered through January 1, 2010, and that further extension was denied.[7] The court therefore finds that a default occurred at least as of January 1, 2010.

---

[7] The debtor argues both that RBA's actions in declaring the Put Agreement default were improper, and that RBA should have approved a second extension. These issues are beyond the scope of the objection to claim and are issues under consideration in a lawsuit initially filed by the debtor against RBA in Dare County, North Carolina, and removed to this court (AP 11-00106-8-SWH) Although a determination of the adversary proceeding may result in a set-off or credit to the amount owed to RBA, it does not affect the claim amount determination. See Rule 3007(b).

Focusing on the appropriateness of the default rate imposed, 7.25%, the debtor concedes that the 3% increase over the contract rate of 4.25% is not excessive. While state law "may give guidance to a federal bankruptcy court determining the reasonableness of a fee . . . the final determination is a matter of federal law." In re Consol. Properties Ltd. P'ship, 152 B.R. 452, 456 (Bankr. D. Md. 1993). There is no evidence that the loan agreement provisions related to the default rate of interest would be unenforceable under state law, and so the court will turn to federal law in its analysis. The general rule regarding the propriety of a claim for interest at the contract default rate is: "where the circumstances necessitating an equitable deviation are plainly absent and the contract interest rate does not violate state usury laws, function as a penalty, or exceed the value of the collateral, the presumption in favor of the contract rate has not been rebutted." In re Dixon, 228 B.R. 166, 174 (W.D. Va. 1998). In determining whether to enforce a default rate of interest, courts often look to the following factors:

> (1) the creditor faces a significant risk that the debt will not be paid;
>
> (2) the lower rate of interest payable pre-default is shown not to be the prevailing market rate;
>
> (3) the difference between the default and the pre-default rates, and whether the differential between the two rates are reasonable; and
>
> (4) whether the purpose of the higher interest rate is to compensate the creditor entitled to interest for losses sustained as a result of the fact that it was not paid at maturity or is simply a disguised attempt to penalize the debtor.

In re Deep River Warehouse, Inc., 2005 WL 1513123 *3, *3-4 (Bankr. M.D.N.C. 2005). Based on these factors, the court finds the default rate in question to be within the range of reasonableness, primarily because the difference between the default and pre-default rates is a mere 3% and therefore does not appear to be intended as a penalty. See also Harvest Oaks Drive Associates, Case No. 10-

03145-8-SWH (Bankr. E.D.N.C. Jan. 14, 2011) (finding a default rate of 11.13%, which consisted of the contract rate of 6.13% plus 5%, to be reasonable, and citing cases in which courts approved default rates of interest where the margin between the default and the contract rate ranged from 10.13% to 15%). In addition, no evidence was offered regarding whether the contract rate is or is not the prevailing market rate of interest, but the court is doubtful that the 4.25% contract rate varies greatly from the prevailing market rate. It is somewhat unclear from the evidence whether there is a significant risk that the debt to RBA will not be paid, however in this case, the second and fourth factors carry the most weight. Based on the foregoing, the court will deny the debtor's objection to RBA's claim to the extent that the debtor objects to the application of the default rate of interest.

Turning to the issue of attorney's fees, the debtor contends that no pre-petition fees are owed to RBA, in light of the debtor's position that the defaults declared are illegitimate. Even if legitimate, the debtor asserts that the 15% flat fee sought, which amounts to $2,470,384.57, is unreasonable. Although fees of 15% have been upheld in Pennsylvania under certain circumstances, the debtor asserts that such fees awards are often striken as grossly excessive and unreasonable.

Also objecting to RBA's claim, EFP contends that a proof of claim is intended to measure the claim as of the petition date, and at most, should include actual attorney's fees up to the petition date. EFP asserts that the actual amount of attorney's fees incurred by RBA[8] as of the petition date is approximately $370,000, and RBA submitted evidence of pre-petition fees totaling $370,397.80. See Exhibits S-1 and T-1. In contrast, EFP notes that the attorney's fees as stated in the proof of

---

[8] RBA engaged Weir & Partners, LLP and Womble Carlyle Sandridge & Rice LLP as local counsel.

9

claim are 181 times larger than the actual amount incurred as of the date of the February 12, 2010 confession of judgment, and 6 times larger than the actual amount incurred pre-petition by two law firms ($370,397.80). As of the January 11, 2012 hearing, EFP estimates that RBA's actual attorney's fees are $1,342,169.08. According to EFP, under Pennsylvania law,[9] RBA must demonstrate that the attorney's fees claimed are reasonable and not excessive, even though the note may have provided for the 15% measure. Further, EFP argues that because of the blanket fee measure, it is unclear whether the fees RBA seeks were accrued only prior to the petition date or also post-petition. EFP contends that only pre-petition fees should be considered in the claim determination process.

In response, RBA contends that its claim of attorney's fees of 15% of the debt is reasonable under Pennsylvania law, especially given the size of the loan and the project. RBA notes that no specific instances of unreasonableness have been raised. In addition, although in agreement that a Pennsylvania court could consider the reasonableness of the attorney's fees awarded, RBA asserts that the inquiry should be not be purely retrospective, as argued by EFP. Instead, the court should consider the full measure of attorney's fees in the case, given the nature of the confession of judgment process. According to RBA, the process is akin to a lawsuit in backwards order, in that the attorney's fees are assessed and a lien is placed on the property at the beginning, in order to protect the creditor's ability to recover attorney's fees, and as a result the judgment must necessarily include the full measure of attorney's fees. To that end, RBA notes that EFP's estimate of fees incurred as of the hearing date is already approximately 50% of the amount awarded in the

---

[9] EFP initially argued that North Carolina law applies but conceded that Pennsylvania law governs whether the attorney's fees claimed are allowable pursuant to the loan documents.

10

confession of judgment, and there is no indication that fees will cease accruing in the near future. Finally, it is RBA's position that the attorney's fees awarded by the Pennsylvania court fall squarely within the pre-petition claim based on the confession of judgment, and that the claim allowance provisions of the Bankruptcy Code do not provide for the post-petition "unvesting" of a right earned pre-petition.

The court has already determined that the Rooker-Feldman doctrine does not limit its inquiry into the reasonableness of the attorney's fees sought by RBA in its proof of claim. The loan documents provide, in broad language, for the recovery of costs and expenses in connection with the enforcement of the loan agreement. See Loan and Security Agreement, p. 36, and Promissory Note, p. 5. The court finds that the appropriate measure for this component of the claim is RBA's actual attorneys' fees incurred up to the petition date. The parties have stipulated that the actual pre-petition fees incurred by RBA amount to $370,397.80. The court has reviewed the relevant time entries and finds the fees reasonable and recoverable under the loan documents. As to RBA's argument that both pre- and post-petition fees are appropriately encompassed by the flat fee sought, the court determines that RBA's § 506(b) motion protects RBA by providing a potential avenue for pursuit of post-petition attorneys' fees. If RBA's argument were accepted, a secured creditor could eviscerate the limitations of § 506(b), i.e., that post-petition attorneys' fees are allowable only to the extent that a creditor is oversecured.

Finally, RBA seeks late fees in the amount of $3,132.15. Although not much was made of the late fee component at the hearing, the court assumes that the $3,132.15 is a late fee charged on the debtor's failure to make timely payment of the last installment due under the note prior to the

January 1, 2010 maturity date. There was no persuasive evidence supporting disallowance of the component, and the late fee is therefore allowed.

Based on the foregoing, the court finds that RBA has an allowed secured claim in the amount of $18,008,562.66 as of the petition date.[10]

B.   RBA's Motion for Post-Petition Interest and Attorneys' Fees

To any extent that the court finds RBA oversecured, RBA seeks allowance of post-petition interest and post-petition attorneys' fees pursuant to § 506(b). This section allows the holder of a secured claim to add post-petition interest and reasonable post-petition attorneys' fees to the secured claim to the extent of the value of the collateral. The evidence of the value of the collateral in the present case consists of the (1) land and improvements; (2) debtor's cash on hand as of March 8, 2012; and (3) adequate protection payments held in escrow by RBA. The sum of these items in accordance with the testimony presented is as follows:[11]

|  |  |
|---|---|
| Land and improvements | $18,500,000 |
| Cash on hand | $     300,000 |
| Escrow for adequate protection | $     348,655 |
|  | $19,148,655 |

---

[10] Principal: $16,306,399.73 + Interest: $1,328,632.98 + Attorney's Fees: $370,397.80 + Late Fees: $3,132.15 = $18,008,562.66.

[11] At the last hearing, on March 8, 2012, undisputed evidence was presented that RBA holds $348,655.07 in escrowed adequate protection payments. As to the debtor's cash collateral on hand, RBA asserted that the debtor holds approximately $300,000; the debtor indicated that it currently had approximately $592,000 in its debtor-in-possession account and that Village Realty had approximately $30,000 in rents and/or fees attributable to the debtor. Although the calculations herein are based on the $300,000 figure asserted by RBA, the court invites the parties to submit a stipulated amount of the debtor's cash collateral on hand as of the March 8, 2012 hearing date, and the court will enter a supplemental/amended order reflecting that amount.

The difference between the value of the collateral, $19,148,655, and the claim amount, $18,008,563, is $1,140,092, which constitutes the amount RBA is eligible to "add on" to its claim under § 506(b). As to the post-petition interest component of the § 506(b) motion, as of May 1, 2012, for example, interest had accrued in the amount of $1,566,444.15.[12] Even considering that this measure of interest is calculated at the simple rate rather than on a compounding scale, the amount of interest accrued is greater than the amount available as an add on under § 506(b). As such, the court will allow RBA post-petition interest in the amount of $1,140,092. The remainder of the accrued post-petition interest to date is disallowed since it is neither recoverable under § 506(b) nor § 502(b)(2). See 11 U.S.C. § 502(b)(2) (providing that the court shall not allow claims for unmatured interest); 4 Collier on Bankruptcy ¶ 506.04[1], at 506-96 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2011); In re Broomall, 131 BR 32 (Bankr. D.Md. 1991) (holding that once an equity cushion is eliminated, an oversecured creditor becomes undersecured and no longer entitled to a claim for accruing interest).

The court need not address allowance of post-petition attorneys' fees as an add-on to the secured claim because no collateral remains to secure such fees, and therefore RBA is not eligible for post-petition attorneys' fees under § 506(b). The court finds that no unsecured claim is created for the post-petition fees sought; rather, the fees are disallowed. Section 506(b) provides a limited substantive right to post-petition fees. If such fees are not allowed under that section, they do not

---

[12] Between the petition date of January 10, 2011, and May 1, 2012, 477 days have passed. Per diem interest is set out in the confession of judgment at $3,283.95 and appears to be calculated on the principal component only, at the default rate. The court finds that post-petition interest at the contract default rate is appropriate, as the filing of the petition did not cure the default. Thus, for the same reasons that the court found the default rate to be an appropriate measure of pre-petition interest in this case, the court finds that post-petition interest at the default rate is reasonable.

morph into an allowable unsecured claim, since there is no section of the Code other than 506(b), that permits allowance of post-petition fees.[13]

C.   RBA's Motion for a Superpriority Administrative Expense Claim

RBA seeks a superpriority, administrative expense claim pursuant to § 507(b), contending that through January 31, 2012, the debtor will have used $1,027,337.82 of RBA's cash collateral and will have only paid $348,655.07 in adequate protection payments, rendering the payments inadequate by $678,682.75.  RBA conceded at the hearing, however, that a certain portion of the debtor's expenditures, namely those for real estate taxes, are attributable to the preservation of the collateral, and thus should be accounted for, resulting in an inadequacy of adequate protection payments in the amount of approximately $385,000, entitling RBA to a § 503(b) administrative expense in this amount.  RBA argues that it is entitled to superpriority under § 507(b) because the adequate protection payments were inadequate, the cash collateral was used to maintain and operate units, and the use of cash collateral was an actual and necessary cost of preserving the estate.

Section 507(b) provides:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim

---

[13] "[T]he Code specifically allows fees to be added to the secured claims of oversecured creditors, but does not specifically authorize their addition to unsecured claims." Interpreting Bankruptcy Code Sections 502 and 506: Post-Petition Attorneys' Fees in a Post-Travelers World, M. Scarberry, 15 Am. Bankr. Inst. L. Rev. 611, 637 (2007).  If § 506(b) does not entitle an unsecured creditor to post-petition attorneys' fees, then by analogy, § 506(b) should not create an unsecured claim where it would not otherwise exist.

14

> under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C.§ 507(b).

RBA argues that the debtor cannot adequately protect it for the use of its rental cash collateral by giving it a replacement lien in that collateral. It follows, RBA asserts, that the use of rents by the debtor without a concomitant increase in its collateral results in a failure of adequate protection. However, the debtor's use of cash collateral for costs associated with the maintenance and operation of the property need not be adequately protected. See In re Smithville Crossing, LLC, Case No. 11-02573-8-JRL (Bankr. E.D.N.C. Sept. 28, 2011). To the extent that $385,000 of cash collateral was used for the operation and maintenance of the property and would qualify as a § 506(c) expense, the court finds no failure of adequate protection, and thus denies the motion for an administrative claim.[14]

## CONCLUSION

The objections filed by the debtor and EFP to Claim No. 2 are **ALLOWED**. RBA shall have an allowed secured claim in the amount of $18,008,562.66, which represents principal, interest, late fees, and actual attorneys' fees incurred up to the petition date. RBA's motion for post-petition interest and post-petition attorneys' fees is **ALLOWED IN PART**, in that RBA is allowed post-

---

[14] The court relies upon the debtor's representations that all cash collateral was used for the operation and maintenance of the property; such representations were not disputed by RBA.

petition interest in the amount of $1,140,092, and **DENIED IN PART**, as to any additional post-petition interest sought, as well as post-petition attorneys' fees, given that the collateral is insufficient to support further interest or fees. Finally, RBA's motion for a superpriority administrative expense claim is **DENIED.**

**SO ORDERED.**

**END OF DOCUMENT**